and call our third case of this morning number 17-3353 Liberty Bell Capital being Warren Hospital at all. Mr. Frank and Mr. Greenspan Good morning, your honors. My name is Alan Frank. I'm representing the plaintiff, Liberty Bell Capital. I would like to request a five-minute rebuttal. This case stems from the post foreclosure agreement. Section 2.1 prohibits Warren Hospital from taking any action to contest, cause the stay of, or otherwise delay the sheriff's sale. And the sheriff's sale occurs, whether it be New Jersey, Pennsylvania, Delaware, it's all the same. It occurs when the sheriff has the auction, puts down the gavel, and then for a period of time after that, there is, before a deed is actually delivered to the party that wins the sale, there is a redemption period, correct? That's correct, your honor. So the sheriff's sale, where the sheriff stood out and had the auction, what did Warren Hospital do that would contest that sale, or cause the stay of that sale, or otherwise delay that particular day? Warren Hospital, through counsel, secretly negotiated a transaction. But people knew that that transaction was being negotiated. You've got a passive member who stands to have a big loss and is trying to save the ship, salvage its investment. And notice was given of that, wasn't it? Not really. At no time during, and by the way, this fact is contested, there was a telephone call on the day before the redemption period elapsed. So that would have been nine days later. So Warren Hospital, through WHMPI, sells its managing partner interest to InMed, right? That's right. So InMed is now controlling things at Hillcrest. And InMed, by virtue of controlling things, takes advantage of a redemption period that is otherwise allowed. Is that correct? Yes, that is correct. Isn't that game set and match? It is not, your honor. First of all, there are other agreements here that were completely disregarded by, in error we believe, by the district court. So what are you basing your claim that somehow InMed, now controlling Hillcrest, can no longer take advantage of a legally prescribed redemption period? We believe that, at a minimum, the operating agreement between InMed and the Warren Hospital entity group precluded a change of control from Warren Hospital to anybody else. What in the operating agreement said there could not be a change of control? Your honor, that's found specifically. Give us the language. The operating agreement is in 471 of the appendix. And at page 490, at section 7.1, we have article 7 entitled Management. And in the context of management, there's a 7.1b and it reads, The members hereby appoint Memorial Parkway Investors as the sole manager of the company for so long as Memorial Parkway Investors is a member. In the event that any affiliate of the hospital is a member in the place of Memorial Parkway Investors, that hospital affiliate shall be the sole manager of the company. In the event that neither Memorial Parkway Investors or any other hospital affiliate is a member, InMed shall have the right to appoint a manager. So where is, if Memorial Hospital or an affiliate is no longer a member, it isn't going to be the managing member. If InMed buys it out, then Memorial Hospital or any affiliate is no longer a member and InMed becomes the managing member, right? Yes, except that there are four other agreements that... Wait a minute, you just pointed, you said it's this agreement that says you can't do that. Yes. Where's the language in what you just quoted to us that says you can't do that? The understanding of the parties at the time this was executed, which was exactly, it was executed on July 3, 2003, which was the same date on which the letter of credit and reimbursement was executed, which was the same date on which the mortgage and security agreement were executed, and in all of these documents, the three documents that I'm mentioning, the operating agreement, the letter of credit and reimbursement agreement, and the mortgage and security agreement, there was an absence of control permitted. As a matter of fact, that may be the way you want to see it, but we listened to you read it and actually, I read it before, I'm having a hard time getting to where you're getting, which is that somehow these parties in an operating agreement have made it impossible for themselves to change their operating arrangement, which you're claiming is that they somehow bound themselves in a way that made it impossible for them ever to change their own operating agreement. Well, they certainly would, at the time that the change occurred, the lender was the plaintiff. The plaintiff stepped into the shoes of these loan documents. In the PFA, that is to say, In the loan documents, but not into the shoes of anybody that was in the operating agreement. You had nothing to do with that and couldn't have had anything to do with it. So if you're pointing to the operating agreement, you're on awfully shaky ground, are you? I don't think so. I think these were taken together. You had the right, you, sorry, your client, obviously. Thank you. Your client had the right to negotiate and be specific and say what it wanted to. Sophisticated lender, right? Sophisticated party? Excellent counsel? And had it wanted to say something like, there will be no change in control, or that's a matter of default, or their redemption period will be disregarded, or you, the Warren Hospital entities, will do nothing to affirmatively help redemption, or if you do help with redemption, that's a violation of your covenants. You could have said any of those things, and it said none of those things, right? Respectfully, Your Honor, we would disagree with that. But you've got to give us reasoning. If it says, let's go back, what you quoted to us says that if Warren Hospital or an affiliate has an interest in Hillcrest, Warren Hospital or that affiliate will be the managing member. Yes. When InMed bought out Warren Hospital and there is no Warren Hospital or any affiliate any longer in Hillcrest, then that particular provision now is inoperative, is it not? We would disagree. How? Tell me how. Go to the conclusions. I think I understand. The letter of credit and reimbursement. You said the operating agreement. Tell me how the operating agreement somehow was violated here by InMed buying out Warren Hospital or its affiliate and becoming the managing member. The operating agreement could not be amended pursuant to the terms of the letter of credit and reimbursement agreement at section 6.16 part C. And the letter of credit and reimbursement agreement were executed in or around the same time in 2003. So who has a right to enforce that violation of the letter of credit agreement? We believe that would be the plaintiff because by the time... Because you're in the shoes of Will Fargo. Correct, Your Honor. And so what happened was even if you read the post foreclosure agreement respecting status of leases, the loan documents are defined. Right. But even if you get over this hurdle... And transfer. Don't you still have a challenge in the sense that as I understand your argument, you're saying, look, it's not enough that the hospital allowed the sheriff's sale to go forward. What we really needed from the hospital was to have it not preclude us from actually gaining title to the property. Is that not the essence of your argument? Absolutely. And I've looked and haven't found where that covenant appears in the document, and it seems to be a really important thing that would have been mentioned in the document had there been a covenant from the hospital to facilitate, aid, abet your client securing title to the property. Judge Wolfson, in her original opinion, denying the 12B6 motion to dismiss, Your Honor, observed that the agreement was ambiguous on two things, the way I understood the opinion. One was with respect to the purposes, in plural, that word was in plural, to request, in other words, cooperation from the defendants. And the other was what really was or was not reasonable under those conditions. We believe that the entire essence of the post-reclosure agreement, at least half of it had to do with a post-acquisition series of behaviors, what would happen with the lease, how the property would be managed, what part of the lease would be given back or conceded by the new lender, that is to say vis-à-vis the defendant occupant hospital. The language is very clear. But there's no covenant for title. Your response, as I hear you, to my question is, look at Judge Wolfson's opinion allowing us to proceed past the 12B stage. Well, we think that Judge Wolfson's opinion was precise and correct with respect to the meaning of the language of the agreement. You like 12B6, Judge Wolfson. You just don't like summary judgment, Judge Wolfson. Well, Judge Wolfson was LA on him. That was Judge Marnotti. Oh, excuse me. That was another case. We're in trouble with those New Jersey judges. We like New Jersey around here. But I see my time is up. I understand your response. Thank you so much. Thank you. Mr. Greenspan. Good morning, Your Honors. May it please the Court. My name is Norman Greenspan. I represent the defendants' FLEs, Warren Hospital, and its affiliated entities. This case at its core is about the interpretation of a contract. On summary judgment, we take a look to see whether there are any material facts that are in dispute. It has to be applied to the law. And with regard to a contract. Why don't you start where Mr. Frank ended. He said there was a 12B6 ruling. Judge Wolfson made some statements about the complaint. They were rulings about what the complaint meant and didn't mean. What the documents meant and didn't mean. And that those rulings cannot be squared with Judge Marnotti's ruling on summary judgment. What's your answer to that? Respectfully disagree. I knew that. What's the specific, why is he wrong? Why is he wrong? Well, first, the standard under rule for a 12B6 motion is totally different. Judge Wolfson had no choice but to accept the allegations, unproven allegations in the complaint as true. Yeah, but what Judge Wolfson was dealing with was not statements of fact at that point, right? The question was what does the document mean? What does the contract mean? That's an interpretive question of laws. Judge Wolfson was interpreting the document and she said certain things about what the document meant. So what changed in the document between the time she said something about what it meant and Judge Marnotti looked at it and said something different about what it meant? Well, certainly nothing changed in the document, Your Honor. Okay. If nothing changed in the document, is it a question of law that the judge is just free to change his or her mind about? Well, if we did, yes. And certainly when we deal here with essentially a de novo review and the review has to do not only with the law but with the facts, it almost all becomes irrelevant. It's up to this court to determine what the contract says or doesn't say. I don't understand Judge Wolfson to have in fact interpreted the contract. What Judge Wolfson did was accept the pleaders, the plaintiffs' interpretation of the contract and made certain statements with regard to, well, if this could be proven, and obviously we needed discovery and we needed the facts, which we now have, and there's been a review of those facts in light of the contract. And that's what Judge Marnotti did. Okay. Can you speak to that? There's nothing, by the way, the ambiguity. Ambiguity hasn't been pled in this case. When you say ambiguity hasn't been pled in this case, I mean, do you have to plead ambiguity or do the parties come in and argue about what the meaning of the contract is and the court has to deal with the ambiguity? No one has, well, I find it hard to distinguish the two. But the language in the contract is clear. And simply a question then of what was the intent of the parties, which in New Jersey the courts can look to, some of the extrinsic evidence, the circumstances within which the contract was entered into. But you still first and foremost look to the contract language itself. Okay. When we do that, when we look at the contract language itself, for example, we look at 2.1 and the language says that it's not going to, hospital entities are not going to contest, cause the stay of, otherwise delay, foreclosure proceedings, share of sale, cash collateral actions, et cetera. I mean, you know the language as well as I do that's hotly contested here. Their argument, not their entire argument, pretty much their entire argument is baked into that is an agreement, which your client was obligated to adhere to with good faith and fidelity, was to not do anything to delay or impede their proceeding to the change of title that would occur with a foreclosure and a sale. That's what they're saying this language means. So what is it about that language which is so clear that when looking at that would say, what could possibly mean that? I don't know how to respond to that. It can't possibly mean that. Why can't it possibly mean that? If the language is read to say you can't contest, cause the stay of, otherwise delay, foreclosure proceedings, share of sale, cash collateral actions, why can't that fairly be read to mean you can't do something to stop us from taking this all the way through change of control. That is, we get the property. Because I don't read the fair, clear language that to expand, to go as far as the plaintiff claims number one. To the extent that there is an entity. Let me ask it this way, Mr. Greenspan. What sense would it make for somebody to negotiate for something that said, you can't stop us and you agree not to do anything to impede us from going to foreclosure. You agree not to do anything to impede us from going to share of sale. You agree not to impede us from doing anything right up to the point of we get title. But if you want to stop us from getting title, that's okay. What would be the logic behind reading it that way? The whole purpose of the agreement, Your Honor, had to do with meeting the primary purpose, almost the entire purpose of the post foreclosure agreement, was to meet the requirements in the St. Luke's Definitive Agreement. But all that couldn't happen until you finally resolve the issue as to who is entitled to title to the property. And what the parties really bargained for here was, let's get to it as soon as we can, and you, the defense in this case, the other parties, you can't contest, cause a stay or delay. Of these things, right? Right. These main things. And my question to you stands, who would negotiate for this and say, in the end we don't care whether the result, the natural result of these things is we get title. We just don't care about that. It's the process we want. We want the process of foreclosure. We want the process of a share of sale. But we don't care about the end result. How is that clear from this language? Because you're saying it's clear that that's not in here, so it must be that they don't care. The parties both understood that Liberty Bell wanted to get title to the property. Okay. Should we be reading this in light of that understanding that both parties wanted that? Absolutely not. Just because they understood that was their intent doesn't mean that was the mutual intent of the parties in entering into this agreement. I thought I just heard you say both parties understood they wanted title. That Liberty Bell wanted title. Correct. Your client knew Liberty Bell wanted title. You're saying you didn't promise to get them title. Exactly. But you promised not to impede the share of sale. Exactly. So to Judge Jordan's point, it's perhaps a little bit formalistic, isn't it, to say that, yeah, we'll let you get a property through share of sale, but we might not let you get title. In the context of all of this was the lawsuit that was going on with InMed. InMed had already sued basically the defendants in this case for breach of the fiduciary duty with regard to the operation of Hillcrest. There's no question. We understand the motivation. I think I understand the motivations of the Warren Hospital entities. They saw a way out of their problem, and they were able to resolve it with InMed. And that was good for the hospital. And so what was good for the hospital at that point was to settle up with InMed and transfer control of Hillcrest to InMed and let InMed do what it wanted to do to redeem the property. That's all perfectly logical that the hospital entities would want to do that. The question isn't whether they wanted to do it. The question is whether 2.1 obligated them not to do that. It did not obligate them in the way that I guess is being suggested by plaintiffs. First of all, I start with a fair reading. Second, if you take a look at where this language came from, 2.1, 2.1 verbatim came from a prior post-foreclosure agreement that was in existence when Wells Fargo owned the debt. The notion that Wells Fargo would have intended this language to prevent the redemption. That's what Wells Fargo wants. So that's sort of an anomaly of this case, right, is that we've got Liberty Bell stepping into the shoes of Wells Fargo. The PFA is substantially similar, right, in almost all respects. But apparently, Wells Fargo and Liberty Bell wanted very different things. Wells Fargo wanted its money back. It didn't want to be a real estate developer. And Liberty Bell did want the property. In the broad picture of things, yes, but they both want, with regard to the share of sale and the foreclosure proceeding and the collateral actions, that they proceed apace and they proceed without my clients contesting, causing the stay or otherwise delay. And the testimony of counsel for the plaintiffs, for Liberty Bell, who negotiated the agreement, who I believe negotiated the agreement, but certainly was involved in all the actions with regard to the foreclosure proceeding and the share of sale, once the note was purchased by Liberty Bell, he testified in his deposition, he was specifically asked, what did our clients do? Did Wells Fargo sell their discount? I'm sorry? Did Wells Fargo sell their discount to Liberty Bell? Yes, they did. They sold it for $10,250,000. And less than five months later, Liberty Bell walks out with almost $12.5 million for that obligation. So Wells Fargo really didn't want to manage this at all. They just wanted it to get out and they were willing to take a discount. Correct. And I don't understand why it wasn't asked by the other side. I mean, they did have notice, but it says 2.1 also provides later on in that provision, that WH Memorial and hospital entities shall take such actions in or with respect to the foreclosure proceedings, any share of sale or the cash collateral actions as, in this case, Liberty Bell, may reasonably request to effectuate the terms and provisions and purposes of this agreement. In other words, it's a further assurances provision. If they had sent, and they had not, but if they had sent a request for further assurances in order to make sure that nothing happened to stop the share of sale from resulting in a deed being issued to Liberty Bell, what would your response be then? That's not a purpose of this agreement because the purpose was never a purpose of this agreement. If they had sent that request. It's a hypothetical question. If they had, what happened here? If there was a further assurance that they would not contest, close the stand? If Liberty Bell sent a request, okay, the share of sale has happened, and we want you to, the hospital entities, to be sure that nothing happens that precludes us from following through and getting a share of steed after the redemption period. Our clients say that that is not consistent with their obligations under the contract. Our client was allowed to stand silent while that happened. We weren't directed to do anything. In fact, one of the questions that was asked during the depositions of a principal of the plaintiff was, with regard to the provision your Honor is looking at, what did you ask my client to do? I agree that they didn't. Correct. That's why I'm asking you a hypothetical question. This case could be a lot. Would it not be more difficult if they had made that request? Well, we'd know exactly what the parties meant at that point in time, certainly, but the request was not made. And it wasn't made in the face of the plaintiffs being told the day before. The defendants had no obligation to inform the plaintiffs that this transaction was going to take place, but because, just out of goodness of their hearts, being up front, they'll know. And if Liberty Bell had the contractual right that they claim that they have now, they would have spoken up right then and there and said you can't do it. Well, they say they have a different view of the facts. They say they made it clear to you that they did want the property, and one might understand that assertion to be not just a shaking of fists at the sky, but an assertion that we've got some legal rights here. It's raised for the first time in the reply in terms of that question as to whether that is a fact dispute. But that's in the face of three affidavits from the lawyers who represented the defendants at that time, each of whom said that we weren't asked to do anything. It wasn't even part of the discussion. And also the testimony of a principal of the plaintiff were asked, did you make any requests to do this or do that? And this was during a telephone conversation. Or any time. Or not do this or not do that. The answer was no. So it's not, I don't know how you interpret or go from logically, make any kind of inference with regard to all right, my clients knew that Liberty Bell wanted to ultimately obtain a title to the property through a legal process. My client didn't say that they would help them during that legal process, other than they wouldn't interfere with it. At the end of the day, all that the hospitals wanted was somebody who was going to own that property, who would fulfill the conditions of the definitive agreement at St. Luke's. If you say they weren't going to interfere with it, their assertion back, of course, is, well, you did interfere with it. The transfer of control affected and was effectively an interference. I misspoke. The words, my client's obligations are specifically set forth in the agreement, and the word interfere I misappropriately used. Okay. Because it's more than what is here. I got you. I simply misspoke. Thank you very much. Mr. Frank. So you knew that there was something being discussed whereby the interest in Hillcrest would be sold to InMed, and there was no objection made to them, at least in the record, and there was no attempt to go to court to stop this. Why? So we've addressed that point in our reply brief beginning at page 7 through page 11. But if you're here now, why didn't you do it at the outset? Hey, gang, this is not what we intended. Both of the people that testified for Liberty Bell testified that, in no uncertain terms, they said they wanted to own the property. And the behavior, which was obliquely described, if you read the testimony of my clients, that they would somehow get paid off was never, at no point in that conversation, is there any evidence that my clients knew or understood that transfer of control was about to occur, which was 24 hours before. Then wasn't there at least a request for further assurance? Hey, looks like you might be doing something. We want you to assure us that the purpose of this agreement, that we get title, is not in any way impeded or limited or stopped. That is happening. Well, according to the testimony of Mr. Peruzzi, which we've quoted on page 9 of our reply, Mr. Peruzzi said, and we told him very strongly, that we would not be very happy with that. And I remember I said something along the lines that, well, you're between a rock and a hard place, because we will not be satisfied. Mr. Greenspan has conceded that they knew what you wanted, but there's an important distinction, is there not, between what someone wants and what someone is contractually entitled to. Yes. All right. So here, how are you contractually entitled? How are you able to force your adversary to facilitate, A, to bet, the conveyance of title to the property, when I don't see the word title mentioned in 2.1. In the recital clauses, Your Honor, at paragraph Q, which is at 132 of the appendix, I'll paraphrase it, the definition of a sheriff's sale is provided. And after the words sheriff's sale are quoted, the sentence continues with the following, will cause the master lease and master sublease to terminate operation of law on account of the foreclosure. Your Honor, that doesn't happen unless a deed is actually issued, as I understand the law. It doesn't say anything about redemption. And, in fact, you, I apologize for saying you, I don't know who it was, but your client, represented to the New Jersey State Court when the effort was made to put off the foreclosure action. When InMED came in and tried to stop this, the quote from 1262 of the appendix, this language, InMED is not harmed by the proceeding of a valid and already scheduled foreclosure sale. The borrower still has a 10-day redemption period after the sale, and in that time, if it is able to bring its financing to fruition, then it will still have an opportunity to force Hillcrest to redeem. InMED cannot ignore this law, et cetera, et cetera. So how is it that your client can go into state court and say, hey, there's no harm here, there's a 10-day redemption period, and if they can put the money together, they can do it, but they're not harmed, and then walk in in this suit and say, that was completely unlawful. Isn't that kind of a little fast and loose? If you're saying that in the state court, how can you come in here and say they had no right to do that? Your Honor, we don't think that statement is incongruous or somehow. Well, help me out, because if you say, and I just quote it to you, there's no harm here, there's a redemption period, if InMED can get the financing, they can get it. How is that consistent with coming in here and saying, there's no way that could lawfully have happened? The attorney that said that, his name is Michael Viscount, Mr. Viscount testified, as I understand it, that he by no means was suggesting that, by making that statement, that that would not somehow otherwise not be a violation of state law. So you were suggesting to the state, Mr. Viscount, or whoever was representing Liberty Bell at the time, was misleading the state court by putting forth an illusory right, a right that really didn't exist, to say, don't worry about it, Judge? Because how can you have it both ways? Either that was a real right that Liberty Bell recognized existed, or you were faking out the state court, Judge, because it didn't really exist. Judge Jordan, we understand your question. My understanding is that at no point was Mr. Viscount observing that the right of redemption could be exercised without repercussions somehow going from the PFAC. Liberty Bell said it. He said there's no harm to InMED because there's a right of redemption, and if InMED can get the financing, then, quote, it will still have an opportunity to force Hillcrest to redeem, unquote. How can that be consistent with there was no meaning, no intent to imply that this could lawfully be done? As I've indicated, Your Honor, he's testified and has, and we've submitted that as part of the transcript. But that's after the, I mean, that language is very clear. InMED's not hurt because it can come in, it has the opportunity to come in and redeem. InMED had no actual opportunity to redeem. And it did it the right way. You're right, InMED can't, but the debtor, Hillcrest, can. InMED could not on its own, I think we agree, redeem. The only party that could have redeemed was Hillcrest, but through the, but it could not in light of the manner in which the control of management was then presently postured. What Mr. Viscount observed was that if the negotiations occurred, at least according to his testimony, then the redemption right could be achieved, even without negotiations, but not at all excusing contractual obligation by the warrant hospital entities under the PFA. Basically, Mr. Viscount was observing that if Mr. Viscount was telling the court, don't worry about it because there can still be redemption. There's no other way to spin that language, Mr. Frank. It's clear as a bell. Thank you, Your Honor. Thank you. Thank you to both counsel. We'll take the matter under advisement.